# IN THE SUPREME COURT OF IOWA

No. 19–1857

Submitted September 23, 2021—Filed April 22, 2022

**STATE OF IOWA,**

    Appellee,

vs.

**KHA LEN RICHARD PRICE-WILLIAMS,**

    Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Lawrence P. McLellan (suppression) and Samantha Gronewald (trial and sentencing), Judges.

The defendant challenges his conviction for being a felon in possession of a firearm under Iowa Code section 724.26, arguing he was subjected to an impermissible seizure and interrogation. **DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

Christensen, C.J., delivered the opinion of the court, in which Waterman, Mansfield, McDonald, Oxley, and McDermott, JJ., joined. Appel, J., filed a dissenting opinion.

Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson (argued), Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Sharon K. Hall (argued), Assistant Attorney General, for appellee.

**CHRISTENSEN, Chief Justice.**

It was late at night when police officers stopped a Lyft vehicle for traffic violations. Upon hearing the passenger's name, one of the officers recognized the passenger from past eluding incidents, including a previous traffic stop with the officer in which the passenger attempted to flee from the traffic stop on foot with a firearm in his hand. Concerned for the officers' safety, the officer ordered the passenger out of the vehicle to conduct a pat-down for weapons. During the pat-down, the passenger admitted in response to questioning from the officer that he had a firearm and the police discovered a firearm in the passenger's coat pocket, leading to a criminal charge of felon in possession of a firearm in violation of Iowa Code section 724.26 (2019).

The passenger moved to suppress all evidence obtained after the exit order, arguing law enforcement violated his rights under article I, section 8 of the Iowa Constitution and the Fourth Amendment to the United States Constitution by ordering him out of the vehicle and subsequently patting him down without reasonable and articulable facts to justify those actions. He also sought to suppress his admission to possessing a firearm, claiming law enforcement violated his state and federal rights against self-incrimination by questioning him about whether he had any weapons on him without a *Miranda*[1] warning. The district court denied the motion to suppress concerning the discovery of the

---

[1] *See Miranda v. Arizona*, 384 U.S. 436, 468–69 (1966).

firearm and the passenger's admission to possessing it and later convicted the passenger following a bench trial on the minutes.

The court of appeals affirmed, and we granted further review. Upon our review, we affirm the court of appeals decision and district court judgment because the officer had reasonable suspicion to justify ordering the passenger out of the vehicle and subsequently patting the passenger down for weapons. Because the State confirmed it is not separately relying on the defendant's admission to possessing a firearm and reasonable suspicion existed to support the pat-down regardless of the admission, we do not address the defendant's *Miranda* claim.

## I. Background Facts and Proceedings.

Around 11:30 p.m. on February 14, 2019, Kha Len Price-Williams was a rear-seat passenger in a Lyft[2] vehicle in Des Moines when Officer Brian Buck of the Des Moines Police Department pulled the Lyft driver over for multiple traffic violations. Officer Buck's body camera captured this encounter. Officer Buck informed the driver of the reasons for the stop and asked him for his license, registration, and proof of insurance. While the driver was retrieving those documents, Officer Buck asked Price-Williams where the driver was taking him. Price-Williams explained he was going to visit his child. Officer Buck asked Price-

---

[2]Lyft is a "[t]ransportation network company" that "uses a digital network to connect transportation network company riders to transportation network company drivers who provide prearranged rides." Iowa Code § 321N.1(5). Lyft drivers use their "personal vehicle to offer or provide prearranged rides to transportation network company riders upon connection through a digital network controlled by a transportation network company in return for compensation or payment of a fee." *Id.* § 321N.1(6)(*b*).

Williams for his identification card, but Price-Williams said he left it at home. Officer Buck then asked Price-Williams for his name, date of birth, and the last four digits of his social security number, which Price-Williams provided. Officer Brandon Holtan arrived to assist Officer Buck as Officer Buck was speaking to the vehicle's occupants.

After retrieving the occupants' information, Officer Buck returned to his vehicle to check whether either of them had outstanding warrants on the police department's mobile database. In the meantime, Officer Holtan turned his body camera on and positioned himself outside the rear passenger side of the vehicle where Price-Williams was sitting. The recording of the first minute of Officer Holtan's conversation with Price-Williams does not contain audio because there is a one-minute buffer period prior to turning the camera on that provides video but not audio. Nevertheless, the video shows Officer Holtan and Price-Williams having what appears to be an amicable conversation.

When the audio begins about a minute into the video, Officer Holtan is heard asking Price-Williams about something that happened in November and Price-Williams indicated he was involved in an eluding incident for speeding. Price-Williams then began to explain again where he was going, stating, "I'm just going home to see my kid. I just, my baby mama, she just got me a Lyft, you can call her. I'm just—I'm just a passenger." He tried to get the mother of his child on the phone to talk to Officer Holtan, but Officer Holtan indicated that was not necessary. Price-Williams then continued to talk about how he noticed the Lyft driver speeding until Officer Holtan asked him to "step out for [him] real quick."

Upon being asked to step out, Price-Williams stated, "say what?" and, though the video becomes dark and harder to see because Officer Holtan moved his flashlight, there was a pause with no conversation. Officer Holtan told Price-Williams again to step out of the vehicle and Price-Williams moved his hand toward his coat pocket. Officer Holtan then warned Price-Williams not to reach and Price-Williams put his arms up as he remained in the vehicle and stated he was putting his phone in his pocket. Officer Holtan drew his weapon and ordered Price-Williams out of the vehicle. Officer Buck observed Officer Holtan draw his weapon while he was still entering the vehicle occupants' information to search for outstanding warrants and quickly left his vehicle to assist Officer Holtan.

After Officer Buck arrived to assist, Officer Holtan can be heard saying that he "arrested [Price-Williams] for a gun about a year ago, so we're going to do a *Terry*[3] pat." As Officer Holtan was patting down Price-Williams, Officer Buck asked Price-Williams if he had any weapons on him. Price-Williams indicated he did, and Officer Buck asked him where the weapons were while Officer Holtan continued to perform the pat-down. Just as Officer Holtan was patting Price-Williams's front coat pocket area, where he felt the weapon, Price-Williams stated the firearm was in his coat pocket and the officers subsequently placed Price-Williams in handcuffs before Officer Buck retrieved a loaded nine-millimeter semiautomatic pistol from the coat pocket. The State formally charged Price-

---

[3] *See Terry v. Ohio*, 392 U.S. 1, 30–31 (1968).

Williams with being a felon in possession of a firearm in violation of Iowa Code

section 724.26, a class "D" felony.[4]

Price-Williams pleaded not guilty and moved to suppress all evidence

obtained during the search and seizure, arguing he "was questioned and seized

without reasonable and articulable facts to justify such actions." The district

court conducted a suppression hearing on the motion. During the hearing,

Officer Holtan testified to his description of the encounter, explaining,

> I was positioned on the passenger side of the vehicle adjacent to the rear seat passenger. When Officer Buck asked [Price-Williams's] name, I recognized his name as Kha[ L]en Price[-]Williams, who I had previously encountered on, I believe December 10, 2017, when I conducted a traffic stop where Kha[ L]en was the driver for a minor traffic offense.

> He then attempted to elude me [in 2017]; stopped the vehicle; ran from the vehicle while holding a firearm; ultimately was taken into custody; and a firearm was located near him.

> And then separate from that encounter, I had heard his name at the station when another officer had arrested him for eluding. And so his name was fresh in my mind from his most recent arrest at the time.

> I engaged him in conversation regarding those events, and I asked him if he had a firearm. His eye contact -- He broke eye contact with me and started to overexplain how he was a passenger in a vehicle and tried to distance himself from the vehicle when obviously I could tell that he was a passenger in a vehicle, and it was clear he was not associated with the driver because he was sitting in the back seat by himself.

> I asked him to step out because I was going to conduct a *Terry* pat; and at that time his demeanor, which was friendly to this point, I observed his fight or flight response to be activated. And it wasn't

---

[4]The State also charged Price-Williams with possession of a controlled substance in violation of Iowa Code section 124.401(5), a serious misdemeanor, after the arresting officers discovered marijuana in Price-Williams's backpack in the Lyft vehicle. However, the State later dropped this charge following a suppression hearing on that evidence.

the fight or flight response, it was the freezing in time where he was attempting to decide what was going to happen next or figure out what was going to happen next.

I advised him not to reach because, at that point, I was more aware of his possibility of being armed, and I drew my firearm because I was so concerned. . . . I motioned for Officer Buck to assist me in doing so; and then [Price-Williams] was taken into custody, and a firearm was located in his front left jacket pocket.

Officer Holtan clarified that it was Price-Williams's change in demeanor and his previous history with Price-Williams that led him to draw his firearm "[f]or [his] safety" because he "felt [Price-Williams] was armed." He also stated he would have continued to perform the *Terry* pat even if Price-Williams had told Officer Buck he did not have a weapon and that he felt the weapon on Price-Williams as he was patting him down.

Following the hearing, the district court denied Price-Williams's motion to suppress as it pertained to the officers' discovery of the firearm and his statements about the firearm. The district court explained,

It was reasonable for Officer Holtan to believe that defendant may be armed and dangerous based upon his previous encounter with the defendant and his action of moving his hand(s) towards his pocket. The patdown that occurred when defendant exited the car was lawful particularly when defendant admitted prior to the patdown he had a gun in his pocket.

Price-Williams waived his right to a jury trial and agreed to a trial on the minutes of testimony. The district court found Price-Williams guilty of being a felon in possession of a firearm in violation of Iowa Code section 724.26 and sentenced him to five years imprisonment consecutive to the sentences he is serving for probation violations that are not a part of this case. Price-Williams filed a timely notice of appeal concerning the district court's denial of his motion

to suppress, and we transferred the case to the court of appeals, which affirmed the district court ruling and Price-Williams's conviction. Price-Williams filed an application for further review, and we granted that application.

## II. Standard of Review.

"When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo." *State v. Brown*, 930 N.W.2d 840, 844 (Iowa 2019) (quoting *State v. Brown*, 890 N.W.2d 315, 321 (Iowa 2017)). Our review is also de novo when a defendant "alleges the district court improperly refused to suppress statements made in violation of his *Miranda* rights." *State v. Miranda*, 672 N.W.2d 753, 758 (Iowa 2003). We examine the entire record to independently evaluate the totality of the circumstances based on each case's unique situation. *Brown*, 930 N.W.2d at 844. Further, "[w]e give deference to the district court's fact findings due to its opportunity to assess the credibility of the witnesses, but we are not bound by those findings." *Brown*, 890 N.W.2d at 321 (quoting *In re Prop. Seized from Pardee*, 872 N.W.2d 384, 390 (Iowa 2015)).

## III. Analysis.

Price-Williams presents two challenges on appeal. First, he maintains the district court erred in denying his motion to suppress the evidence obtained from the officers' warrantless search and seizure because the officers lacked reasonable suspicion to search his person. Second, Price-Williams contends the officers subjected him to custodial interrogation by questioning him about his possession of a firearm without first providing a *Miranda* warning about his right

against self-incrimination, so the district court should have granted his motion to suppress his admission to firearm possession.

**A. Law Enforcement's Authority to Search and Seize Motor Vehicle Passengers.** The parties agree that Officer Buck's initial stop of the vehicle was valid and the temporary detainment of the vehicle's occupants was a seizure under article I, section 8 of the Iowa Constitution and the Fourth Amendment to the United States Constitution. *See, e.g., State v. Warren*, 955 N.W.2d 848, 859 (Iowa 2021) ("The '[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of' the Fourth Amendment." (alteration in original) (quoting *Whren v. United States*, 517 U.S. 806, 809–10 (1996))). The parties' disagreement lies in their interpretation of article I, section 8 of the Iowa Constitution. The State argues that a law enforcement officer may order a passenger out of a legally stopped vehicle without reasonable suspicion, relying on *Maryland v. Wilson*, 519 U.S. 408, 414–15 (1997). Price-Williams seeks a broader interpretation that requires "reasonable suspicion that criminal activity is afoot or that a passenger is armed and dangerous . . . before an officer can order a passenger out of a vehicle."

In arguing for departure, Price-Williams relies on our now-overruled precedent in *State v. Becker*, in which we held law enforcement could not order passengers out of the vehicle under the Fourth Amendment unless there was "articulable suspicion of wrongdoing on [the passenger's] part or any need to move him in order to facilitate arrest of the driver or search of the vehicle." 458

N.W.2d 604, 607–08 (Iowa 1990); *see State v. Smith*, 683 N.W.2d 542, 545 (Iowa 2004) ("*Wilson*, therefore, overruled *Becker* sub silentio as far as its reliance on the Fourth Amendment."). We need not address Price-Williams's request for us to depart from federal precedent and adopt the heightened standard articulated in *Becker* under the Iowa Constitution because Officer Holtan had reasonable suspicion to order Price-Williams out of the vehicle. Thus, Price-Williams's motion to suppress fails even under the heightened *Becker* standard he requests.

An officer may expand a reasonable investigation "to satisfy suspicions of criminal activity unrelated to the traffic infraction" during a traffic stop by ordering the passenger out of the vehicle if the officer identifies " 'specific and articulable facts which, taken together with rational inferences from those facts,' amount to reasonable suspicion that further investigation is warranted." *Warren*, 955 N.W.2d at 866 (quoting *State v. Salcedo*, 935 N.W.2d 572, 578 (Iowa 2019)). Officers need not

> rule out all possibility of innocent behavior . . . [because] [t]he test is founded suspicion . . . . Even if it was equally probable that the vehicle or its occupants were innocent of any wrongdoing, police officers must be permitted to act *before* their reasonable belief is verified by escape or fruition of the harm it was their duty to prevent.

*State v. Kreps*, 650 N.W.2d 636, 642 (Iowa 2002) (second omission in original) (quoting *United States v. Holland*, 510 F.2d 453, 455 (9th Cir. 1975)). "[A]n officer may [also] make a protective, warrantless search of a person when the officer, pointing to specific and articulable facts, reasonably believes under all the circumstances that the suspicious person presents a danger to the officer or to others." *State v. Riley*, 501 N.W.2d 487, 489 (Iowa 1993) (discussing *Terry* pat-

downs). "We evaluate the existence of reasonable suspicion based on the totality of circumstances confronted by the officer." *Salcedo*, 935 N.W.2d at 578.

An officer may have reasonable suspicion to order a passenger out of the vehicle based on a combination of the officer's past experience with the passenger and the passenger's failure to provide identification upon request, furtive movements, and "nervousness, evasiveness or lying." *State v. Bergmann*, 633 N.W.2d 328, 333 (Iowa 2001); *see also Riley*, 501 N.W.2d at 489. For example, in *State v. Riley*, an officer stopped the driver because he allegedly was not wearing his seat belt, but the officer decided to talk with the passenger because the officer recognized the passenger "but could not place him" and "[i]t later developed that [the officer] had arrested [the passenger] on a prior occasion." 501 N.W.2d at 487–88. As the officer was approaching the passenger side, the passenger made furtive movements that led the officer to believe the passenger had placed something under his seat and prompted the officer to ask the passenger out of the car so the officer could search under the passenger seat. *Id.* at 488. We concluded the officer had reasonable suspicion to support ordering the passenger out of the vehicle to search under the passenger seat based on the passenger's furtive movements and failure to provide identification to the officer. *Id.* at 489.

Similarly, in *State v. Bergmann*, we noted an officer may have reasonable suspicion to warrant a pat-down based on the defendant's presence in a known narcotics-dealing area "coupled with other factors like flight upon seeing police, nervousness, evasiveness or lying, past experience with the suspect, etc." 633

N.W.2d at 333. There, the officer observed the defendant parked in an alleyway in "an area notorious for drug activity" with "a well-known narcotics dealer . . . standing next to the passenger side of the car." *Id.* at 330. The drug dealer immediately left upon noticing the officer and the defendant began to drive away, at which point the officer noticed the defendant's license plate light was not lit and decided to pull him over. *Id.* Upon making contact with the defendant, the officer recognized him from an arrest he made a few years prior involving possession of a handgun and marijuana. *Id.* The officer asked the defendant to step out of the car to show him the unlit license plate, and the officer noticed the defendant "was acting anxious and impatient." *Id.* The defendant declined to give consent to search the vehicle, so the officer called the canine unit. *Id.* at 330–31.

While the officer waited for the unit to arrive, he patted down the defendant for weapons and looked under the driver's seat for a weapon, which is where he had found a weapon in his prior arrest of the defendant, but the officer found nothing. *Id.* at 331. The canine unit arrived "within minutes," and the dog indicated it smelled a controlled substance inside the vehicle, leading the officers to search the entire vehicle and find marijuana in it. *Id.* Our court determined the officer had reasonable suspicion to pat-down the defendant for weapons based on the defendant's presence in a known drug area alongside a drug dealer coupled with the defendant's flight upon seeing the police when he was parked, his nervousness, evasiveness, and the officer's past experience with the defendant. *Id.* at 333. We also held the officer was "justified in looking under [the defendant's] seat for a weapon given his past experience with [the defendant.]."

*Id. Riley* and *Bergmann* are instructive and lead us to conclude Officer Holtan had reasonable suspicion to order Price-Williams out of the vehicle.

To set the scene, Officer Holtan arrived at the beginning of the traffic stop as Officer Buck was obtaining information from the vehicle's occupants in the dark, late at night. Upon hearing Price-Williams identify himself, Officer Holtan recognized his name from a prior encounter that occurred fourteen months earlier in which Price-Williams attempted to elude Officer Holtan by running from the vehicle while holding a firearm during a traffic stop for a minor offense. He also recognized Price-Williams's name from another officer who told him about Price-Williams's more recent arrest for eluding.

As Officer Buck was checking for outstanding warrants on the vehicle's occupants, Officer Holtan engaged in conversation with Price-Williams. When Officer Holtan asked Price-Williams about an eluding incident for speeding that past November and whether he had a firearm, Price-Williams became nervous, breaking eye contact with Officer Holtan and trying to eliminate his responsibility for the traffic stop by talking about how he was just going to visit his child and was "just a passenger," even attempting to get Officer Holtan to talk to the mother of Price-Williams's child on the phone. It was at this point that Officer Holtan told Price-Williams to step out of the vehicle. In light of Officer Holtan's past experience with Price-Williams involving eluding and firearm possession during a traffic stop, Officer Holtan's specific knowledge of Price-Williams's criminal history, the diminished visibility because the stop was at night in the dark, and

Price-Williams's nervous demeanor, Officer Holtan had reasonable suspicion to order Price-Williams out of the vehicle.

These same circumstances justified Officer Holtan's pat-down search of Price-Williams. To justify a pat-down of a passenger "during a [lawful] traffic stop, . . . the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). Citing legislative changes making it easier to carry concealed weapons in Iowa and the increase in the number of American adults holding concealed firearm permits between 1999 and 2016, Price-Williams maintains that "the mere presence of a firearm on a person [should not] be equated with inherent dangerousness." We need not address whether the mere presence of a firearm on a person equates to inherent dangerousness because the circumstances that amounted to reasonable suspicion in this case exceed mere firearm possession, especially in light of Price-Williams's specific criminal history involving eluding while holding a firearm during a traffic stop with the same officer in the past. For the reasons discussed above, Officer Holtan had reasonable suspicion that Price-Williams was armed and dangerous to support the *Terry* pat-down under both the Iowa Constitution and the United States Constitution.

**B. Price-Williams's Admission to Possession of a Firearm.** Price-Williams claims the district court erred in denying his motion to suppress his admission to possessing a firearm when Officer Buck asked him about firearms during the *Terry* pat-down, asserting the admission stemmed from custodial interrogation without first being read his *Miranda* rights. In its brief, the State

confirmed it was "not separately rely[ing] on [Price-]Williams'[s] admission in support of the weapons pat-down." In any case, Officer Holtan had already begun to pat-down Price-Williams to locate and retrieve the firearm that he suspected Price-Williams had in his possession before the admission occurred and Officer Holtan had reasonable suspicion to suspect Price-Williams was armed and dangerous before Price-Williams made the admission. Consequently, we affirm the district court's denial of his motion to suppress the evidence of his admission and his subsequent conviction.

**IV. Conclusion.**

We affirm the district court's denial of Price-Williams's motion to suppress and Price-Williams's conviction for the aforementioned reasons.

**DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

Waterman, Mansfield, McDonald, Oxley, and McDermott, JJ., join this opinion. Appel, J., files a dissenting opinion.

**APPEL, Justice (dissenting).**

### I. Introduction.

From the early days of the republic, the fundamental principle of constitutionally based search and seizure law is that law enforcement authorities simply cannot have broad and unbridled discretion to indiscriminatorily search and seize persons on the streets of this country.

There simply can be no doubt, as a matter of historical truth, that the federal and Iowa constitutional founders viewed search and seizure as restrictions on the exercise of government power, instead of an authority on broad searches based upon subjective hunches.[5] James Otis, the founding father of the Fourth Amendment, responding to the broad and unparticularized search and seizure powers in the famous "Writs of Assistance Case" in 1761, complained about the writ's "arbitrary power" that could transform officers into tyrants who could lord over colonists, and "place[d] the liberty of every man in the hands of every petty officer."[6] The founders not only appreciated the potential lack of

---

[5]For instance, see Thomas Y. Davies, *Can You Handle the Truth? The Framers Preserved Common-Law Criminal Arrest and Search Rules in "Due Process of Law"—"Fourth Amendment Reasonableness" Is Only a Modern, Destructive, Judicial Myth*, 43 Tex. Tech. L. Rev. 51, 55 (2010) (describing a general warrant as "unparticularized as to the place or things to be searched for or . . . lack[s] specific factual grounds justifying the search").

[6]Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 580–81 (1999) [hereinafter Davies, *Recovering the Original Fourth Amendment*] (quoting 2 *Legal Papers of John Adams* 140–43 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965)).

fairness in the discretionary application of state power, but they fully believed that if such arbitrary power is granted, it will ultimately be exercised.[7]

From its inception, search and seizure law generally required that articulable and particularized facts be established to demonstrate certain individuals have been engaged in criminal enterprise before the awesome government machinery searches and seizes persons and their property. Conversely, categorical, general policy or programmatic judgments are anathema to search and seizure's constitutional values. Broad and unregulated authority to engage in stops and pat-downs by armed police on the open road may be "a long step down the totalitarian path," as Justice Douglas observed long ago.[8] Such authority was by no means part of the vision of the founders of either the Iowa or United States Constitution. A leading scholar, Tracey Maclin, has observed "the central meaning of the Fourth Amendment is distrust of police power and discretion."[9] Similarly, Professor Amsterdam noted that the Fourth Amendment opposes searches and seizures "conducted at the discretion of executive officials, who may act despotically and capriciously in the exercise of the power to search and seize. This . . . concern runs against *arbitrary* searches and seizures: it condemns the petty tyranny of unregulated rummagers."[10]

---

[7]Anthony G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 366 (1974) [hereinafter Amsterdam].

[8]*Terry v. Ohio*, 392 U.S. 1, 38 (1968) (Douglas, J., dissenting).

[9]Tracey Maclin, *The Central Meaning of the Fourth Amendment*, 35 Wm. & Mary L. Rev. 197, 201 (1993); *see also* Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. at 582 (noting the framers' "deep-rooted distrust and even distain for the judgment of ordinary officers").

[10]Amsterdam, 58 Minn. L. Rev. at 411.

Of course, one of the main historic purposes of search and seizure law is to protect the privacy of the individual. In our constitutional scheme, the individual has the right to make a wide range of choices free from government intrusion. In other words, the search and seizure protections are designed to protect, in the trenchant words of Justice Brandeis, the individual's "right to be let alone."[11] Central to our constitutional structure is the important protection of the individual to be free from government interference, which is usually packaged in the language of individual rights or civil liberties.

There is, however, a second purpose of search and seizure law, albeit less heralded in some quarters. That purpose is to prevent government authorities from engaging in arbitrary or discriminatory enforcement against unfavored groups of people. The Tudors and Stuarts used general warrants in a programmatic way to deal with political opposition, allowing its bearer to arrest, search, and seize at his discretion. The *Wilkes* cases in the 1760s demonstrated that if left unfettered, government authorities would use generalized search power as a tool against political opponents. Therefore, historically, search and seizure law was motivated not simply to protect individual rights, but also to ensure that disfavored groups are not singled out through indiscriminate application of government power.[12]

---

[11]*Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting), *overruled by Katz v. United States*, 389 U.S. 347 (1967), *and Berger v. New York*, 388 U.S. 41 (1967).

[12]For a summary of the history, see Laura K. Donohue, *The Original Fourth Amendment*, 83 U. Chi. L. Rev. 1181, 1207–21 (2016).

Thus, as Andrew Taslitz has shown, there is a connection between First and Fourth Amendment principles.[13] Whenever government officials claim the power to search and seize large groups of people with broad general characteristics that may be consistent with innocence, the principles of the search and seizure law provide a bulwark to limit and control the exercise of otherwise unfettered discretion.

The implications of search and seizure principles to African-Americans has been an issue of historical importance. In 1823, the Massachusetts Supreme Judicial Court ruled in *Commonwealth v. Griffith* that the 1793 version of the Fugitive Slave Act violated search and seizure principles.[14] Samuel Chase, a leading antislavery lawyer, argued that in the widely reported "*Matilda*" case that the Fugitive Slave Act was unconstitutional because of its broad and indiscriminate application to African-Americans.[15]

The implication of search and seizure principles in the context of racial equality was recognized early on in Iowa in the case of *Webb v. Griffith*.[16] In this case, an African-American residing in Iowa was arrested for alleged violation of an 1851 exclusion law.[17] Judge John Henry Gray struck down the law as

---

[13]Andrew E. Taslitz, *Reconstructing the Fourth Amendment: A History of Search and Seizure, 1789–1868*, at 88–89 (2006) [hereinafter Taslitz, *Reconstructing the Fourth Amendment*].

[14]*Commonwealth v. Griffith*, 19 Mass. (2 Pick.) 11 (1823); *see also* William M. Wiecek, *The Sources of Antislavery Constitutionalism in America, 1760–1848*, at 193 (1977) [hereinafter Wiecek].

[15]Wiecek at 193.

[16]Nathan E. Coffin, *The Case of Archie P. Webb, A Free Negro, in* 11 *Annals of Iowa* 200, 200–02 (1913) [hereinafter Coffin].

[17]*Id.*

violating the search and seizure provisions of the Iowa Constitution.[18] No blanket interdiction of African-Americans was legal, according to Judge Gray.[19] In the *Webb* case, Judge Gray recognized what antislavery lawyers had been pressing for years—namely, that the seizure of African-Americans based upon race violated search and seizure principles.[20] The principle of equality helped define arbitrary government conduct.

Of course, the United States Supreme Court had views on the Fourth Amendment quite different from Judge Gray's approach to the search and seizure provision of the Iowa Constitution. The United States Supreme Court six years after Iowa's *Webb* case, announced in *Dred Scott v. Sanford* that African-Americans had "no rights which the white man was bound to respect."[21] In short, the Court hung a "whites only" sign onto the majestic sculpture of the Fourth Amendment. According to the United States Supreme Court (but notably not the Iowa courts), search and seizure restrictions applied when a person of German, Dutch, or Norwegian ancestry was seized, but not to African-Americans.

But the "whites only" sign originally hung on the Fourth Amendment by the United States Supreme Court was, one would have thought, taken down by the people. The enactment of the Fourteenth Amendment, with its promise of equal protection, provided a new lens for viewing federal search and seizure

---

[18]*Id.*

[19]*Id.*; *see also* Robert R. Dykstra, *Bright Radical Star: Black Freedom and White Supremacy on the Hawkeye Frontier* 198–200 (1993).

[20]Coffin at 204–14.

[21]*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 407 (1857), *superseded by constitutional amendment*, U.S. Const. amend. XIV.

law.[22] History, however, plays its tricks. In the aftermath of the Civil War, particularly, but not exclusively, in former slave states, the swollen ranks of police forces enforced vague vagrancy laws to ensure a racial social order and provide a basis for seizure and control of African-Americans.

Modern scholars and some courts have examined the interplay between search and seizure and equal protection principles. Although the United States Supreme Court in *Whren v. United States*[23] sought to lobotomize our collective legal brain by drawing a sharp distinction between search and seizure principles and equal protection, that constitutional surgery has come under substantial criticism in academia and state courts and, as will be seen, is in my view indefensible.[24]

The limitations imposed by search and seizure law were thus designed not only to protect individual rights, but also to perform the important prophylactic purpose of preventing programmatic oppression of disfavored groups. As noted

---

[22]*See* Taslitz, *Reconstructing the Fourth Amendment* at 106–21 (2006) (arguing that the Fourteenth Amendment impacted the meaning of constitutional rules regarding search and seizure); I. Bennett Capers, *Policing, Race, and Place*, 44 Harv. C.R.-C.L. L. Rev. 43, 74 (2009).

[23]*Whren v. United States*, 517 U.S. 806, 813 (1996).

[24]*See State v. Brown*, 930 N.W.2d 840, 871–928 (2019) (Appel, J., dissenting). At the risk of over-simplification, I generally subscribe to what Herbert Packer called the due process model of criminal procedure rooted in a complex of values that includes equality and antiauthoritarianism. *See* Herbert L. Packer, *Two Models of the Criminal Process*, 113 U. Pa. L. Rev. 1, 16–18 (1964). While some (but not all) of the opinions of this court in the search and seizure area focus too much on what I call rights restricting radical pragmatism, we should not shy away from our historic commitments to controlling government discretion and protecting individual rights simply because there is a more efficient approach available that affirms a conviction. *See, e.g., State v. Kilby*, 961 N.W.2d 374, 383 (Iowa 2021) (permitting prosecution to comment where motorist exercises right against self-incrimination by refusing to take a breath test); *State v. McGee*, 959 N.W.2d 432, 439 (Iowa 2021) ("almost always" permitting warrantless searches of unconscious persons involved in traffic accidents); *Brown*, 930 N.W.2d at 895 (refusing to regulate pretextual searches for common traffic violations to advance the "war on drugs").

by Professor Amsterdam, the framers recognized that "one evil of the existence of arbitrary power is the inevitability of its discriminatory exercise."[25] Judges should ask, in every search and seizure case, whether the framework and principles developed by courts advance or undermine the constitutional goal of avoiding arbitrary enforcement against disfavored groups that the framers thought would inevitably occur as a result of broad official discretion.

I now briefly turn to methods. Because of the compelling need to control government power of search and seizure, the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution rely heavily upon the probable cause requirement and the warrant requirement.

Probable cause requires that before a search warrant is issued the government establish—with particularity—the basis for proposed government action.[26] General discretionary authority to conduct a search or seize a person was among the historical abuses that the particularity requirements in search and seizure law were designed to prevent.

The requirement that a warrant be sought from a detached and neutral magistrate represents a decided judgment of the founders that authority to determine whether a search or seizure of persons or property is required ordinarily rests with a judge and not with the persons engaged in the search or seizure. Search and seizure provisions of both the Iowa and United States

---

[25]Amsterdam, 58 Minn. L. Rev. at 366.

[26]*See generally* Thomas K. Clancy, *The Role of Individualized Suspicion in Assessing the Reasonableness of Searches and Seizures*, 25 U. Mem. L. Rev. 483 (1995).

Constitutions are thus quite explicit in this regard—judges, and not police officers, make the call. As noted by one scholar, the framers had "deep-rooted distrust and even disdain for the judgment of ordinary officers."[27] As declared in the first major search and seizure case decided by the United States Supreme Court, "It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis* [(resist the beginnings)]."[28] In a classic statement, the United States Supreme Court declared in *Coolidge v. New Hampshire* that:

> [T]he most basic constitutional rule in this area is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable . . . ." The exceptions are "jealously and carefully drawn," and there must be "a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative."[29]

And, in *Johnson v United States*, it was stated that "[w]hen the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent."[30]

By imposing a warrant requirement, the founders recognized what we would call today the possibility of hindsight bias. The structure of requiring a warrant before the fact prevents post hoc rationalizations of the basis for the

---

[27]Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. at 582.

[28]*Boyd v. United States*, 116 U.S. 616, 635 (1886); *see also* Wayne R. LaFave, *The Forgotten Motto of* Obsta Principiis *in Fourth Amendment Jurisprudence*, 28 Ariz. L. Rev. 291 (1986) [hereinafter LaFave, *The Forgotten Motto*].

[29]*Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (second omission in original) (footnotes omitted) (first quoting *Katz*, 389 U.S. at 357; then quoting *Jones v. United States*, 357 U.S. 493, 499 (1971); and then quoting *McDonald v. United States*, 335 U.S. 451, 456 (1948)).

[30]*Johnson v. United States*, 333 U.S. 10, 14 (1948).

search, and permit the court to "prevent hindsight from coloring the evaluation of the reasonableness of a search or seizure."[31]

In this case, we deal with an innovative and historically strange exception to the warrant requirement first discovered by the United States Supreme Court more than 150 years after the founding in *Terry v. Ohio*.[32] In *Terry*, the United States Supreme Court found a narrow exception to the traditional warrant and probable cause requirements in situations where police had articulable and particular facts suggesting that a citizen was "armed and dangerous."[33] The *Terry* decision, to put it mildly, was highly controversial at the time and is currently faced with calls in some quarters for revision.[34]

Kha Price-Williams does not challenge the central holdings in *Terry* in this case under article I, section 8 of the Iowa Constitution. Price-Williams does not challenge the general proposition that warrantless stop-and-frisk actions by police may be justified upon a showing of less than probable cause, namely reasonable suspicion. As a result, we have no occasion to revisit the *Terry* doctrine as has been urged by some commentators. In light of the advocacy, we therefore apply the general standards of *Terry* to this case. In so doing, we may

---

[31] *United States v. Martinez-Fuerte*, 428 U.S. 543, 565 (1976); *see also Beck v. Ohio*, 379 U.S. 89, 96 (1964).

[32] *Terry*, 392 U.S. 1 (majority opinion).

[33] *Id.* at 27.

[34] *See, e.g.*, David A. Harris, *Factors for Reasonable Suspicion: When Black and Poor Means Stopped and Frisked*, 69 Ind. L.J. 659, 682–87 (1994) [hereinafter Harris, *Factors for Reasonable Suspicion*] (calling for abandonment of *Terry* or at least its recalibration); L. Song Richardson, *Cognitive Bias, Police Character, and the Fourth Amendment*, 44 Ariz. St. L.J. 267, 287–93 (2012) [hereinafter Richardson, *Cognitive Bias*] (recommending consideration of hit rates, enhanced articulation, and limiting consideration of race and racial proxies).

apply the general *Terry* standards in a fashion different than federal precedents.[35]

Nonetheless, in construing and applying exceptions to the warrant requirement, we should not lose sight of the basic purposes of search and seizure law, measuring both the impact on individual liberty and the goal of preventing arbitrary and capricious exercise of government power on disfavored groups. As understood by the framers, " 'unreasonable searches and seizures' included any type of general search, whether by warrant or not."[36]

Not surprisingly, there is a tendency in law enforcement to constantly push the search and seizure envelope from its historic roots to expand police authority and avoid the constitutionally based regulatory regime that search and seizure law demands. In *Terry*, Justice Douglas in dissent presciently predicted that one of the dangers of the new "reasonable suspicion" standard was that it would be subject to the "hydraulic pressures" of the demands of law enforcement and, over time, would be subject to serious erosion.[37] Thirty years later, distinguished commentators noted that "pressure from those who do not favor the Fourth Amendment is endemic."[38] It is our job to see that the hydraulic

---

[35]*See, e.g., State v. McNeal*, 867 N.W.2d 91, 99 n.1 (Iowa 2015); *State v. Edouard*, 854 N.W.2d 421, 452–53 (Iowa 2014) (Appel, J., concurring specially); *State v. Tyler*, 830 N.W.2d 288, 291–92 (Iowa 2013); *State v. Oliver*, 812 N.W.2d 636, 650 (Iowa 2012).

[36]George C. Thomas III, *Time Travel, Hovercrafts, and the Framers: James Madison Sees the Future and Rewrites the Fourth Amendment*, 80 Notre Dame L. Rev. 1451, 1467 (2005).

[37]*Terry*, 392 U.S. at 37–39 (Douglas, J., dissenting).

[38]Jack B. Weinstein & Mae C. Quinn, Terry*, Race, and Judicial Integrity: The Court and Suppression During the War on Drugs*, 72 St. John's L. Rev. 1323, 1324 (1998); *see also* Erik Luna, *Drug Exceptionalism*, 47 Vill. L. Rev. 753, 759–61 (2002) (noticing that reasonableness has been used to constrict Fourth Amendment rights rather than expand them in drug related cases).

pressures cannot overcome the constitutional requirements of search and seizure law.

Finally, with respect to methods, it should be recognized that there is a temptation to reason backward in search and seizure cases where incriminating evidence is found.[39] It is important in search and seizure cases that we not engage in such backward reasoning. "[T]here is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all."[40] As Justice Frankfurter memorably observed, civil liberties tend to be invoked by "not very nice people."[41]

Finally, there are four recent developments that require careful consideration in our discussion of search and seizure issues today.

First, we should give careful consideration to the dramatic increase in gun ownership in the United States and the abandonment of regulation of firearms by many states. The proliferation of guns may make some smile and others cry. One's view on the proliferation of guns in our society is beside the point for purposes of search and seizure law. The point is that the number of persons carrying weapons has grown exponentially in recent years. According to one

---

[39]*See United States v. Hussain*, 835 F.3d 307, 309 (2d Cir. 2016) ("Appeals based on the Fourth Amendment from denied motions to suppress . . . are often difficult because the Government is in a sense proven right.").

[40]*Arizona v. Hicks*, 480 U.S. 321, 329 (1987). For a discussion of hindsight bias, see Bernard Chao et al., *Why Courts Fail to Protect Privacy: Race, Age, Bias, and Technology*, 106 Calif. L. Rev. 263, 279–86 (2018) (noting that hindsight bias and outcome bias can impact decision-making by courts); William J. Stuntz, *Warrants and the Fourth Amendment Remedies*, 77 Va. L. Rev. 881, 911–13 (1991).

[41]*United States v. Rabinowitz*, 339 U.S. 56, 69 (1950) (Frankfurter, J., dissenting), *overruled in part by Chimel v. California*, 395 U.S. 752 (1969).

study, it is estimated that three million people carry loaded handguns on a daily basis.[42] Many states, including Iowa, have enacted statutes deregulating carrying of concealed weapons.[43] The question arises whether a stop-and-frisk based on suspected carrying of a firearm can be sustained because it amounts to a general warrant based not on particular facts but involving a broad group of people engaging in lawful conduct. In other words, has widespread proliferation of weapons destroyed the particularity required to support government search and seizure?

Second, there has been a dramatic increase in recent years in our knowledge about implicit racial bias.[44] In addition, in a roughly parallel development, there has been a growing body of empirical studies of racial disproportionality in traffic stops.[45] I do not subscribe to the view that our constitutional law should waiver with each new empirical study or well-written

---

[42]Ali Rowhani-Rahbar et al., *Loaded Handgun Carrying Among US Adults, 2015*, 107 Am. J. Pub. Health 1930, 1935 (2017).

[43]*See* Iowa Code § 724.7(1) (2019).

[44]*E.g. State v. Williams*, 929 N.W.2d 621, 638–39 (Iowa 2019) (Wiggins, J., concurring in part and dissenting in part) (providing statistics showing Iowa was one of the worst states in the nation regarding racial disparity in imprisonment and such disparate treatment is due to implicit racial bias; listing studies on how implicit biases are held deep in the subconscious in various contexts).

[45]*E.g. Brown*, 930 N.W.2d at 864–65 (Cady, C.J., dissenting) (citing articles discussing how *Whren* has been widely criticized as legalizing racial profiling in the context of traffic stops); David A. Harris, *"Driving While Black" and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops*, 87 J. Crim. L. & Criminology 544, 550–53 (1997) (noting the *Whren* Court downplayed the argument that police could make pretexual traffic stops against minorities); Lewis R. Katz, *"Lonesome Road": Driving Without the Fourth Amendment*, 36 Seattle U. L. Rev. 1413, 1421–33 (2013) (noting that *Whren* "solidified a trend in United States jurisprudence toward ignoring police officers' racial biases, admitted or otherwise" and concluding the only workable solution to pretextual traffic stops is through a reconsideration of *Whren*); Wayne R. LaFave, *The "Routine Traffic Stop" from Start to Finish: Too Much "Routine," Not Enough Fourth Amendment*, 102 Mich. L. Rev. 1843, 1860–61 (2004) (discussing the difficulties of an equal protection challenge to selective enforcement of traffic laws).

article appearing in a social science journal. Yet, I do insist that when our knowledge of social science and empirical studies reach a turning point demonstrating reliability, we should consider the new information as we seek to develop our search and seizure law.

Third, we should consider realities on today's streets. As noted in *Terry* so many years ago, minority communities often feel the sting of what they consider harassment by police.[46] Further, it has become apparent that escalation arising out of traffic stops has ended in the death of too many people, often members of minority groups.[47] We should at least ask the question: does our search and seizure law encourage the safety of both police and persons in a traffic stop, or, does it increase the danger to everyone involved? If so, is the increased danger a question of constitutional significance?

Fourth, technology is now available to assist courts in review of traffic stops. When *Terry* was decided, dashcams and bodycams were not in widespread use, but today they are utilized as a matter of routine. The availability of this evidence allows police, the suspect, and the courts to better consider whether there are "articulate" and "particularized" facts that support a *Terry* stop.

In this case involving a warrantless pat-down arising from a traffic stop, I approach the matter with the constitutionally required skepticism, put the State

---

[46]*Terry*, 392 U.S. at 14–15 (majority opinion).

[47]Wesley Lowery, *A Disproportionate Number of Black Victims in Fatal Traffic Stops*, Wash. Post, Dec. 24, 2015, https://www.washingtonpost.com/national/a-disproportionate-number-of-black-victims-in-fatal-traffic-stops/2015/12/24/c29717e2-a344-11e5-9c4e-be37f66848bb_story.html [https://perma.cc/8M4C-EXUC].

to its burden of proof, and examine the record to ensure that the warrantless search is adequately supported based on particularized facts, not weak or generalized reasoning. In the analysis, I consider the recent developments in the constitutional and statutory law related to owning and carrying guns, our increased knowledge of implicit bias and race discrimination in traffic stops, and questions about the safety of police and citizens in the context of traffic stops.

**II. Stop-and-Frisk under *Terry v. Ohio.***

**A. General Framework.** In the seminal and highly controversial *Terry* case, the United States Supreme Court considered a case in which police conducted an unwarranted pat-down search for weapons on a person outside a store that the officer thought was being cased for a potential robbery.[48] In *Terry*, the United States Supreme Court announced a two-part standard for stop-and-frisk.[49] First, the person may be seized for a brief stop upon reasonable suspicion that the suspect is involved or about to be involved in criminal activity.[50] Second, the outer clothing may be frisked if the officer "has reason to believe that he is dealing with an armed and dangerous individual."[51] Ample post-*Terry* caselaw

---

[48]*Terry*, 392 U.S. at 4–8. For critics of *Terry*, see Tracey Maclin, Terry v. Ohio*'s Fourth Amendment Legacy: Black Men and Police Discretion*, 72 St. John's L. Rev. 1271, 1286 (1998); Josephine Ross, *Warning: Stop-and-Frisk May Be Hazardous to Your Health*, 25 Wm. & Mary Bill Rts. J. 689, 732 (2016) [hereinafter Ross].

[49]*Terry*, 392 U.S. at 27–31.

[50]*Id.* at 30.

[51]*Id.* at 27.

supports the notion that there must be reasonable suspicion that criminal activity is afoot before the individual is subject to a protective frisk for weapons.[52]

The approach in the *Terry* case was designed to be something of a compromise. It extended search and seizure protections to pat-down searches and roadside stops.[53] Yet, it permitted an exception to the warrant requirement and the requirement of probable cause.[54] The *Terry* opinion, however, stressed that the exception was "narrowly drawn"[55] and that objective facts drove the analysis.[56] Under *Terry*, police must have articulate and particularized facts to support the search: inchoate hunches are simply not good enough.[57] Further, the *Terry* case recognized the constitutional interests of citizens, noting that even a limited search of outer clothing "constitutes a severe, though brief, intrusion upon cherished personal security."[58] And finally, the *Terry* Court recognized the potential negative reactions of African-Americans to what may be perceived as harassment and discriminatory enforcement.[59] Such potential resentment was to be among the factors to be considered in evaluating the constitutionality of police conduct.[60]

---

[52]*E.g. United States v. Massenburg*, 654 F.3d 480, 485 (4th Cir. 2011); *Gomez v. United States*, 597 A.2d 884, 890–91 (D.C. 1991); *In re Ilono H.*, 113 P.3d 696, 700 (Ariz. Ct. App. 2005).

[53]*Terry*, 392 U.S. at 17–20.

[54]*Id.* at 27.

[55]*Id.*

[56]*Id.* at 20–22.

[57]*Id.* at 22.

[58]*Id.* at 24–25.

[59]*Id.* at 14 n.11.

[60]*Id.* at 17.

In the cases since *Terry* was decided, however, the "narrow" doctrine has been, much as Justice Douglas predicted, under substantial pressure from law enforcement to stretch it far beyond its original confines. For instance, the United States Supreme Court in *Arizona v. Johnson* held that a traffic stop may be made in the absence of criminal activity.[61] Similarly, in *Whren* the Court held that any traffic violation, however minor, provides sufficient basis for a traffic stop from which could become the first step in a series of events leading to a *Terry* search.[62] Remarkably, a stop was lawful even if the stated reason of a minor traffic violation was pretextual.[63] And, the Court in *Heien v. North Carolina* held that a *Terry* search could be based on reasonable suspicion even if premised on mistake of law,[64] a proposition rejected by this court.[65] Then, in *Illinois v. Wardlow*, the Court held that mere presence in a high crime neighborhood or flight from an officer, standing alone, did not establish reasonable suspicion, but a combination of them was sufficient.[66] Finally, in *Utah v. Strieff*, the Court permitted a search based upon an outstanding warrant that officers were not aware existed at the time of the search.[67]

Further, many of the stop-and-frisk cases after *Terry* seem to have loosened the constitutional moorings. For example, the United States Supreme

---

[61]*Arizona v. Johnson*, 555 U.S. 323, 327, 330 (2009).

[62]*Whren*, 517 U.S. at 818.

[63]*Id.* at 814–16.

[64]*Heien v. North Carolina*, 574 U.S. 54, 60 (2014).

[65]*State v. Scheffert*, 910 N.W.2d 577, 585 n.2 (Iowa 2018).

[66]*Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000).

[67]*Utah v. Strieff*, 579 U.S. 232, 239 (2016).

Court has vaguely emphasized that courts consider "the whole picture" rather than specific facts,[68] that meeting the general standards of a drug courier profile may give rise to individualized suspicion,[69] and that flight from officers may in some conditions support a finding of reasonableness sufficient to support a stop-and-frisk.[70]

This kind of slippage in the caselaw vindicates Professor LaFave, who, years ago, opined that judges have forgotten the ancient concept of "[r]esist the opening wedge!"[71] Many commentators noted the degree to which subsequent caselaw has applied the general *Terry* principles in a manner that seems to have drifted from the initial, narrow confines of the case.[72]

A major factor in the slippage has been the adoption of a "totality-of-the-circumstances" test.[73] Under the totality of the circumstances, reasoned analysis is impeded by the notion that everything is relevant and nothing dispositive. Because of its lack of structure, the totality-of-the-circumstances approach allows courts to validate what amounts to mere hunches with some constitutional window dressing. Further, totality-of-the-circumstances tests

---

[68]*United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

[69]*United States v. Sokolow*, 490 U.S. 1, 10 (1989).

[70]*Wardlow*, 528 U.S. at 124–25.

[71]LaFave, *The Forgotten Motto*, 28 Ariz. L. Rev. at 294.

[72]*See, e.g.*, Harris, *Factors for Reasonable Suspicion*, 69 Ind. L.J. at 661–69; Lewis R. Katz, Terry v. Ohio *at Thirty-Five: A Revisionist View*, 74 Miss. L.J. 423, 485–97 (2004); Gregory Howard Williams, *The Supreme Court and Broken Promises: The Gradual But Continual Erosion of* Terry v. Ohio, 34 How. L.J. 567, 576–81 (1991).

[73]*Illinois v. Gates*, 462 U.S. 213, 230–39 (1983).

raise serious rule of law problems as they are not predictable and invite arbitrary application.

**B. Distinction Between "Hunch" and "Reasonable Suspicion."** Under *Terry* and its progeny, the first prong is reasonable suspicion that a crime is being committed.[74] What amounts to reasonable suspicion has never been very clear. The United States Supreme Court has stated that reasonable suspicion must be based on "articulable" facts and more than " 'inchoate and unparticularized suspicion or "hunch" ' of criminal activity."[75] The Court has said that reasonable suspicion is a "fluid concept," and one that is "not readily, or even usefully, reduced to a neat set of legal rules."[76]

Further, in evaluating reasonable suspicion, the United States Supreme Court has directed courts to consider the totality of the circumstances.[77] As students of legal history know, the totality-of-the-circumstances test was considered a failure as a standard for determining when an interrogation was custodial in cases prior to *Miranda v. Arizona*[78] and has proved problematic as an approach to determining consent to search as announced in *Schneckloth v. Bustamonte*.[79] A rule that everything is relevant and nothing is dispositive

---

[74]*Terry*, 392 U.S. at 21.

[75]*Wardlow*, 528 U.S. at 123–24 (quoting *Terry*, 392 U.S. at 27).

[76]*Gates*, 462 U.S. at 232.

[77]*Id.* at 230–39; *see also Terry*, 392 U.S. at 19–21.

[78]*Miranda v. Arizona*, 384 U.S. 436 (1966).

[79]*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); *see* Yale Kamisar, Gates*, "Probable Cause," "Good Faith," and Beyond*, 69 Iowa L. Rev. 551, 570–71 (1984).

threatens to evade judicial review by elevating aggregate conclusions and refusing to permit reasoned analysis.

The second step under *Terry* is deciding whether there is reason to believe the individual is "armed and dangerous."[80] In making that determination, *Terry* directs that the test is an objective one.[81] Because of the vague nature of reasonable suspicion, concern has been expressed that police will in fact rely increasingly on subjective means in determining whether to engage in a *Terry* pat-down.[82]

It is important to note that a "hunch" is a statement of a conclusion without reasonable support. Yet, many of the statements that might support reasonable suspicion run perilously close to mere assertions. Commentators have suggested that police assertions of factors that gave rise to reasonable suspicion should be subject to empirical exploration to segregate a hunch from reasonable suspicion. For instance, in *Wardlow,* the United States Supreme Court declared that flight could be a basis for reasonable suspicion if it occurred in a "high crime area."[83] But such a factor would be substantially undermined by empirical evidence suggesting that this was simply not true.[84]

What method can be used to separate mere hunches from articulate and particularized suspicion then? Professor Tracey Maclin has suggested an

---

[80] *Terry,* 392 U.S. at 27.

[81] *Id.* at 21.

[82] Jeffrey Fagan, Terry*'s Original Sin,* 2016 U. Chi. Legal F. 43, 85–86 (2016).

[83] *Wardlow,* 528 U.S. at 124–25.

[84] *See* Richardson, *Cognitive Bias,* 44 Ariz. St. L.J. at 291–92.

answer.[85] According to Professor Maclin, "The fundamental point is that police officials should not be free to effect seizures based upon factors allegedly possessed by those engaged in criminal conduct, but also shared by a significant percentage of innocent persons . . . ."[86] To allow general characteristics held by the many to morph into articulate and particular cause is inconsistent with the framework of *Terry* itself. And, in reviewing stop-and-frisks, we should keep in mind the command of *Terry* that "courts still retain their traditional responsibility to guard against police conduct which is over-bearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires."[87] As Professor Amsterdam has taught us, without a careful and disciplined approach to reasonable suspicion, courts "covert[] the fourth amendment into one immense Rorschach blot."[88]

**C. Does "Armed and Dangerous" Mean "Armed *and* Dangerous"?** *Terry* itself involved a case in which police officers feared that the person who was suspected of casing a store for a robbery was armed.[89] *Terry* thus stands for the proposition that police may engage in a pat-down search if the officers at the time have reasonable suspicion that criminal activity is afoot and the person is

---

[85]Tracey Maclin, *The Decline of the Right of Locomotion: The Fourth Amendment on the Streets*, 75 Cornell L. Rev. 1258, 1320–27 (1990).

[86]*Id.* at 1324.

[87]*Terry*, 392 U.S. at 15.

[88]Amsterdam, 58 Minn. L. Rev. at 393.

[89]*Terry*, 392 U.S. at 4–7.

armed and dangerous.[90] Further, *Terry* declared that "the officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."[91]

A threshold question is whether an individual must be armed *and* dangerous or whether a person who is armed is presumed to be dangerous. In *Terry,* the suspect was believed to be casing a department store.[92] Where the suspected crime involves a robbery, a person who is armed is a present danger and, as a result, subject to a *Terry* search. A fair case can be made that *Terry* involved a particularized finding of danger based on the nature of the crime and the present threat of violence associated with it.[93] When the *Terry* Court states its holding, it declares that a limited pat-down search is appropriate when a person is "armed *and* dangerous," not "armed *or* dangerous" or just "armed."[94] And, in multiple instances, the *Terry* Court uses the language "armed and *presently* dangerous."[95]

Indeed, this was one of the points made by Justice Harlan in his concurrence in *Terry.*[96] According to Justice Harlan, the newly authorized stop-

---

[90]*Id.* at 30.

[91]*Id.* at 27.

[92]*Id.* at 4–7.

[93]*United States v. Robinson*, 846 F.3d 694, 704 (4th Cir. 2017) (en banc) (Wynn, J., concurring).

[94]*Terry*, 392 U.S. at 25 (emphasis added); *see also Robinson*, 846 F.3d at 704–05.

[95]*Terry*, 392 U.S. at 24, 30 (emphasis added).

[96]*Id.* at 31–34 (Harlan, J., concurring).

and-frisk was not designed to uncover dangerous weapons but was instead designed to protect police from hostile persons.[97]

Further, in *Johnson*, the United States Supreme Court considered the validity of a pat-down search of a person in the context of an automobile stop.[98] Factors involved in the case included prior incarceration for burglary, possession of a scanner which might be used to evade police, wearing clothing consistent with gang membership, and being from a location where that gang was present.[99] On remand, the Court expressly left open further consideration of whether the individual was armed and dangerous by the Arizona court.[100]

There are cases of the United States Supreme Court that suggest that possession of a gun is inherently dangerous. In *McLaughlin v. United States*, the Court held that an unloaded weapon was a dangerous weapon.[101] The *McLaughlin* Court declared that "a gun is an article that is typically and characteristically dangerous" and "the use for which it is manufactured and sold is a dangerous one."[102]

Since *Terry*, the United States Supreme Court in *District of Columbia v. Heller*[103] and *McDonald v. City of Chicago*[104] dramatically expanded the meaning

---

[97]*Id.* at 31–32.

[98]*Johnson*, 555 U.S. at 326–27.

[99]*Id.* at 328.

[100]*Id.* at 334 n.2.

[101]*McLaughlin v. United States*, 476 U.S. 16, 17–18 (1986).

[102]*Id.* at 17.

[103]*District of Columbia v. Heller*, 554 U.S. 570, 595 (2008).

[104]*McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010).

of the Second Amendment to include an individual right to bear arms. Clearly, there has been a change in the landscape regarding the lawfulness of citizens carrying weapons. The number of firearms in the hands of the public has dramatically increased in recent years, and, unlike in the past, it is now lawful to carry a concealed weapon in public places.[105] An argument can now be made that with so many persons lawfully possessing handguns, authorization of law enforcement to search a person for possession of a weapon amounts to a type of general warrant that the Fourth Amendment was designed to prevent. Under this argument, a *Terry* search is not permissible for a mere possession of a gun. Instead, there must be a showing of reasonable suspicion that the individual is not only armed, but is also *dangerous*. Recent federal appellate caselaw is mixed on the question of whether police must establish that an individual is not only armed but is also dangerous.[106]

The armed equals dangerous cases reason that a gun may be used to attack officers and that a person could use a gun to inflict serious injury on

---

[105]*See* Shawn E. Fields, *Stop and Risk in a Concealed Carry World*, 93 Wash. L. Rev. 1675, 1679–80, 1696–99 (2018) (advocating a "gun possession plus" standard and noting all fifty states and the District of Columbia authorize their citizens to carry concealed weapons in public, among which forty-two states impose little or no conditions on this practice); *see also* Royce de R. Barondes, *Automatic Authorization of Frisks in* Terry *Stops for Suspicion of Firearms Possession*, 43 S. Ill. U. L.J. 1, 2 (2018) [hereinafter Barondes].

[106]There is a growing body of commentary exploring the question of whether "armed" means "dangerous" or whether they are two separate requirements for a *Terry* stop. *See generally* J. Richard Broughton, *Danger at the Intersection of Second and Fourth*, 54 Idaho L. Rev. 379 (2018); Alexander Butwin, Note, *"Armed and Dangerous" a Half Century Later: Today's Gun Rights Should Impact* Terry's *Framework*, 88 Fordham L. Rev. 1033 (2019); Aaron D. Davison, Comment, *When One Word Changes Everything: How the Unitary Concept Dismantles the Basis of* Terry *Frisks*, 97 N.C. L. Rev. 192 (2018); Matthew J. Wilkins, Note, *Armed and Not Dangerous? A Mistaken Treatment of Firearms in* Terry *Analyses*, 95 Tex. L. Rev. 1165 (2017); Barondes, 43 S. Ill. U. L.J. at 15–23.

police officers.[107] Representative of this viewpoint is the opinion of Judge Niemeyer in the en banc decision of the United States Court of Appeals for the Fourth Circuit in *United States v. Robinson*.[108] Judge Niemeyer noted that in *Terry*, the United States Supreme Court stated that "a reasonably prudent man would have been warranted in believing petitioner was armed *and thus presented a threat to the officer's safety*."[109] Judge Niemeyer also quoted similar language from *Pennsylvania v. Mimms*, "Mimms was armed *and thus posed a serious and present danger to the safety of the officer . . . .*"[110] Judge Niemeyer concentrated on the "thus" in these sentences as establishing that being armed is being dangerous for purposes of *Terry*. Further, Judge Niemeyer argued that Robinson's position "fail[ed] as a matter of logic to recognize that the risk inherent in a forced stop of a person who is armed exists even when the firearm is legally possessed."[111] There is caselaw from the Ninth and Tenth Circuits tending to support Judge Niemeyer's approach.[112]

In contrast, the two-pronged armed and dangerous cases require more than suspicion of mere possession of a firearm to support a *Terry* stop.[113] The

---

[107] *See, e.g.*, *Robinson*, 846 F.3d at 698–700 (majority opinion); *United States v. Rodriguez*, 739 F.3d 481, 488–89 (10th Cir. 2013); *United States v. Orman*, 486 F.3d 1170, 1176–77 (9th Cir. 2007).

[108] *Robinson*, 846 F.3d 694.

[109] *Id.* at 700 (quoting *Terry*, 392 U.S. at 28).

[110] *Id.* (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977) (per curiam)).

[111] *Id.* at 701.

[112] *See Orman*, 486 F.3d at 1176; *Rodriguez*, 739 F.3d at 491.

[113] *See Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1132 (6th Cir. 2015) ("Where it is lawful to possess a firearm, unlawful possession 'is not the default status.' " (quoting *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013))); *United States v. Ubiles*, 224 F.3d 213, 218 (3d Cir. 2000) ("This situation is no different than if . . . Ubiles possessed a wallet, a perfectly

armed and dangerous cases emphasize that *Heller*[114] and state laws across the country liberally permit citizens to carry concealed weapons. With many citizens now engaged in legal concealed weapons possession, the exercise of this right cannot be a basis for an intrusive search. According to this line of authority, the Second Amendment right to carry weapons should not be a basis for surrendering search and seizure rights. The cases seem to be a variant of the expression "guns don't kill, people do."

The two-pronged armed and dangerous theory was explained by Judge Sutton in *Northrup v. City of Toledo Police Department.*[115] In this case, Northrup was walking his dog with a gun openly holstered on his hip.[116] A motorcyclist observed the gun and confronted Northrup.[117] When police arrived in response to the motorcyclist's 911 call, they asserted Northrup pulled out his cell phone, which was holstered on his hip, and moved his hands back toward the weapon.[118] Police then disarmed Northrup and asked him to turn around with his hands over his head.[119] When Northrup refused to comply and asked why police were present, an officer "walked up and unsnapped and temporarily took

---

legal act in the Virgin Islands, and the authorities had stopped him for this reason."); *State v. Serna*, 331 P.3d 405, 410 (Ariz. 2014) ("In a state . . . that freely permits citizens to carry weapons, both visible and concealed, the mere presence of a gun cannot provide reasonable and articulable suspicion that the gun carrier is presently dangerous."); *see also State v. Bishop*, 203 P.3d 1203, 1218–19 (Idaho 2009); *State v. Vandenberg*, 81 P.3d 19, 25–26 (N.M. 2003).

[114]*Heller*, 554 U.S. at 595.

[115]*Northrup*, 785 F.3d 1128.

[116]*Id.* at 1130.

[117]*Id.*

[118]*Id.*

[119]*Id.*

possession of his firearm."[120] Northrup was handcuffed and spent thirty minutes in a squad car.[121] After police determined Northrup had a concealed carry permit, Northrup was cited for "failure to disclose personal information" under an Ohio statute and released.[122] The charge was ultimately dismissed, and Northrup sued alleging, among other things, violation of his Fourth Amendment rights.[123]

The officer sought summary judgment on the ground that he had reasonable suspicion that Northrup was engaged in criminal activity because of two undisputed facts: (1) Northrup was visibly carrying a gun in his holster, and (2) the officer was responding to a 911 call.[124] The district court denied the officer's motion to dismiss Northrup's Fourth Amendment claim.[125]

On interlocutory appeal, the Sixth Circuit affirmed the district court. According to Judge Sutton, the police were required to show that Northrup was armed and dangerous in order to justify their actions in seizing Northrup's gun.[126] But, according Judge Sutton, the officer only saw Northrup's gun; there was no showing of dangerousness.[127] Judge Sutton asserted that to allow stops based upon mere possession of a handgun "would effectively eliminate Fourth

---

[120]*Id.*

[121]*Id.* at 1133–34.

[122]*Id.* at 1130.

[123]*Id.* at 1130–31.

[124]*Id.* at 1131.

[125]*Id.*

[126]*Id.* at 1132.

[127]*Id.* ("Yet all he ever saw was that Northrup was armed—and legally so.").

Amendment protections for lawfully armed persons."[128] There is a body of other federal caselaw supporting the armed and dangerous viewpoint.[129]

In addition, an argument can be made that because the term "armed" is so broad,[130] there should be an additional element of dangerousness. According to this argument, the mere possession of many objects that might be described as a weapons are not categorically dangerous.

There are a handful of cases that suggest that the nature of the crime being investigated may be a factor in determining whether a person who is suspected of being armed is also dangerous.[131] In the words of one court, guns are "tools of the trade" of narcotics dealers.[132] These cases seem more aligned with Judge Sutton's approach in *Northrup* than Judge Niemeyer's approach in *Robinson.*

At least one state supreme court has adopted what amounts to an armed and dangerous approach under its state constitution.[133] Supreme courts in Arizona, Idaho, and New Mexico have adopted the armed and dangerous approach under their interpretations of the Fourth Amendment.[134]

---

[128]*Id.* (quoting *United States v. King*, 990 F.2d 1552, 1559 (10th Cir. 1993)).

[129]*See United States v. Leo*, 792 F.3d 742, 752 (7th Cir. 2015); *Black*, 707 F.3d at 540; *Ubiles*, 224 F.3d at 218.

[130]*Robinson*, 846 F.3d at 703–04 (Wynn, J., concurring) (citing *Wright v. New Jersey*, 469 U.S. 1146, 1149 n.3 (1985)).

[131]*See United States v. Adams*, 759 F.2d 1099, 1108–09 (3d Cir. 1985) (noting that weapons could be tools of trade in a case where weapons were found with a major supplier of narcotics).

[132]*United States v. Oates*, 560 F.2d 45, 62 (2d Cir. 1977) (quoting *United States v. Wiener*, 534 F.2d 15, 18 (2d Cir. 1976)).

[133]*Coleman v. State*, 553 P.2d 40, 46 (Alaska 1976).

[134]*Serna*, 331 P.3d at 409–10; *Bishop*, 203 P.3d at 1218; *Vandenberg*, 81 P.3d at 25.

Finally, it is worth considering which interpretation of armed and dangerous is most consistent with the constitutional values behind search and seizure limitations. In *Minnesota v. Dickerson*, Justice Scalia famously doubted that "the fiercely proud men who adopted our Fourth Amendment would have allowed themselves to be subjected, on mere *suspicion* of being armed and dangerous, to such indignity . . . ."[135] If Justice Scalia is right, what does that mean for the stop-and-frisk in this case? Certainly, the approach of the majority in this case is completely inconsistent with Justice Scalia's vision in *Dickerson.*

**D. "Nervousness" and "Anxiety."** There is a body of caselaw holding that if an officer declares that a person appears nervous or anxious, that is a basis for a lawful warrantless search and seizure.[136] In *State v. Bergmann*, nervousness was cited as a factor among others in finding reasonable suspicion for a stop-and-frisk.[137]

But who can deny that just about everyone is nervous and anxious when pulled over by the police, even for a minor traffic stop?[138] If nervousness and anxiety were sufficient, everyone pulled over by the police at a traffic stop would be subject to warrantless searches and seizures. We must be careful that

---

[135]*Minnesota v. Dickerson*, 508 U.S. 366, 381 (1993) (Scalia, J., concurring).

[136]*See, e.g., United States v. Hunnicutt*, 135 F.3d 1345, 1350 (10th Cir. 1998) (holding reasonable suspicion was found when the passengers were extremely nervous); *United States v. Sowers*, 136 F.3d 24, 27 (1st Cir. 1998); *United States v. Lindsey*, 451 F.2d 701, 703 (3d Cir. 1971); *State v. Dunbar*, 85 A.3d 421, 424 (N.J. Super. Ct. App. Div. 2014).

[137]*State v. Bergmann*, 633 N.W.2d 328, 333 (Iowa 2001).

[138]*United States v. McKoy*, 402 F. Supp. 2d 311, 317–18 (D. Mass. 2004) ("Nervousness is a natural reaction to police presence."); *Barraco v. State*, 537 S.E.2d 114, 117 (Ga. Ct. App. 2000) ("[N]ervous behavior of a person who has been stopped by an armed law enforcement officer is not an unusual response.").

nervousness does not permit stop-and-frisk of a "very large category of presumably innocent travelers."[139] That would be the equivalent of a general warrant whose evils were a major driver not only of the Fourth Amendment but of the American Revolution itself.[140]

It is not surprising that a number of courts have given the nervousness or anxiety factor little-to-no weight in determining reasonable suspicion.[141] As noted by one court, nervousness "is an unreliable indicator, especially in the context of a traffic stop. Many citizens become nervous during a traffic stop, even when they have nothing to hide or fear."[142]

Further, courts have left individuals in a "condemned if you do, condemned if you don't" position with regards to the nervousness inquiry, particularly when vague descriptors like eye contact or apprehensiveness are utilized.[143] As noted in *United States v. Johnson,* a person involved in an

---

[139]*Reid v. Georgia*, 448 U.S. 438, 441 (1980) (per curiam).

[140]*United States v. Eustaquio,* 198 F.3d 1068, 1071 (8th Cir. 1999) (noting Fourth Amendment violation when "too many people fit this description for it to justify a reasonable suspicion of criminal activity"); *State v. Schlosser*, 774 P.2d 1132, 1138 (Utah 1989) ("When confronted with a traffic stop, it is not uncommon for drivers and passengers alike to be nervous and excited . . . .").

[141]*E.g. United States v. Samuels*, 443 F. App'x 156, 159–61 (6th Cir. 2011) (citing *United States v. Arvizu*, 534 U.S. 266, 275–76 (2002)); *United States v. Andrews*, 600 F.2d 563, 566 n.4 (6th Cir. 1979) (refusing to give weight to nervousness, noting that the government made contrary arguments in prior cases); *People v. Powell*, 667 N.Y.S.2d 725, 728 (App. Div. 1998) ("In light of the recognized 'unsettling' aspect of a police-initiated inquiry of citizens, we reject the People's suggestion that defendant's allegedly nervous reaction to this questioning authorized a greater intrusion." (citations omitted)).

[142]*United States v. Richardson*, 385 F.3d 625, 630–31 (6th Cir. 2004) (citation omitted).

[143]*Compare State v. Jackson*, 892 So. 2d 71, 76 (La. Ct. App. 2004) (noting the "defendant appeared extremely nervous and fidgety, [and] refused to make eye contact"), *with United States v. Cardona*, 955 F.2d 976, 982 n.15 (5th Cir. 1992) (noting that the defendant appeared "too calm").

automobile stop faces a no-win dilemma: "Had Johnson averted his eyes and slouched, he might have been considered evasive. Because he stood straight and maintained eye contact, [the officer] considered him aggressive. Johnson simply could not win. Nervous indicators are weak indicators in the traffic-stop context."[144]

Similar observations have been made by Judge Richard Posner: "Whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should not be credited."[145] Indeed, while nervousness is sometimes said to be a factor in reasonable suspicion, some courts have found that "unusually calm" demeanor can also support reasonable suspicion.[146]

To the extent nervousness has been properly considered, it is usually linked with evasive behavior.[147] As noted by the Sixth Circuit in *Joshua v. DeWitt*, reasonable suspicion may be supported by nervous, evasive behavior but not simply nervous behavior, which proves very little.[148] Evasive actions such as running away from police may have a degree of objectivity, but detecting evasive

---

[144]*United States v. Johnson*, 482 F. App'x 137, 145 (6th Cir. 2012).

[145]*United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005) (citing *United States v. Jones*, 269 F.3d 919, 927–29 (8th Cir. 2001)); *see also United States v. Prandy-Binett*, 995 F.2d 1069, 1077 n.3 (D.C. Cir. 1993) (Edwards, J., dissenting) ("It is well known, by now, that the police will cite virtually *any* circumstance noted prior to arrest or a *Terry*-stop in order to justify the defendant's detention.").

[146]*E.g. United States v. Himmelwright*, 551 F.2d 991, 992 (5th Cir. 1977).

[147]*Wardlow*, 528 U.S. at 124 (stating that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion).

[148]*Joshua v. DeWitt*, 341 F.3d 430, 445 (6th Cir. 2003).

maneuvers of one sitting in an automobile seems much more subjective (and therefore impermissible) in nature.

Further, we must recognize the impact of racial anxiety on interactions between white officers and black citizens. Racial anxiety can cause an individual to be self-conscious or hypervigilant.[149] The stress of racial anxiety is associated with sweating, increased heart rate, twitching, fidgeting, and avoiding eye contact.[150] It is normal in the context of a traffic stop to have tensions based on racial anxiety as well as the normal stresses associated with an exercise of police authority on the individual.

**E. "Furtive Movements."** And then there is the "furtive movement" issue. As noted in *Floyd v. New York City*, "Courts have also recognized that furtive movements, standing alone, are a vague and unreliable indicator of criminality."[151] A Sixth Circuit case has noted that the phrase "furtive gestures" may be a characterization rather than independent fact.[152] A federal district court also disapproved the position that any movement by someone being approached is by definition furtive.[153] "[M]ovement alone is not what courts are to consider, but rather movement signifying danger within a particular

---

[149]L. Song Richardson, *Implicit Racial Bias and Racial Anxiety: Implications for Stops and Frisks*, 15 Ohio St. J. Crim. L. 73, 78–81 (2017) [hereinafter Richardson, *Implicit Racial Bias*].

[150]*Id.*

[151]*Floyd v. City of New York*, 959 F. Supp. 2d 540, 580 (S.D.N.Y. 2013).

[152]*DeWitt*, 341 F.3d at 443–44.

[153]*United States v. McKoy*, 402 F. Supp. 2d at 321 (citing *Blackie v. Maine*, 75 F.3d 716, 722 (1st Cir. 1996)).

context."[154] In *State v. Riley,* we found a furtive gesture of rummaging around under the seat looking for something, accompanied by a failure to provide identification together supported a *Terry* stop-and-frisk under the Fourth Amendment.[155]

As a vague concept, the concept of furtive movements opens the door to implicit bias. As noted in *Floyd*:

> [R]ecent psychological research has shown that unconscious racial bias continues to play an objectively measurable role in many people's decision processes. It would not be surprising if many police officers share the latent biases that pervade our society. If so, such biases could provide a further source of unreliability in officers' rapid, intuitive impressions of whether an individual's movements are furtive and indicate criminality.[156]

Indeed, one of the grave problems with Iowa law is that our search and seizure jurisprudence on the road permits pretextual stops based on minor traffic violations.[157]

In the end, there seems to be what one scholar has called "a script making process" at work.[158] The magic words in the script are nervousness, furtive movements, anxiety. But the descriptive labels, at their root, are entirely or largely subjective and conclusory in nature. And mere conclusions should not

---

[154]*Id.*

[155]*State v. Riley*, 501 N.W.2d 487, 490 (Iowa 1993).

[156]*Floyd*, 959 F. Supp. 2d at 580–81 (footnotes omitted).

[157]*Brown*, 930 N.W.2d at 854 (majority opinion).

[158]*See generally* Robert P. Abelson, *Script Processing in Attitude Formulation and Decisionmaking, in Condition and Social Behavior* 33 (John S. Carroll & John W. Payne, eds. 1977).

provide sufficient particularity to authorize the government to search and seize.[159]

**F. Prior Criminal History.** In this case, it is undisputed that Price-Williams had a prior criminal history. Caselaw makes clear that criminal convictions in the past may be a factor in determining reasonable suspicion.[160] But, "[s]tanding alone, a criminal record . . . 'is not sufficient to create reasonable suspicion of anything.' "[161] Among the factors that should be considered, however, are the age of the past conviction and whether there is any evidence of continuing conduct.[162] Where convictions are older and where there is no evidence of a continued violation, their value in the reasonable suspicion analysis is considerably diminished. As noted by the Sixth Circuit in *Johnson*, suspicion based on a suspect's prior criminal record is little more than a hunch.[163]

**G. Citizen Interests at Stake.** In evaluating warrantless searches and seizure, we must also be clear-eyed about what is at stake. The invasions

---

[159]According to Professor LaFave, "One of the themes running though the decisions on the Fourth Amendment probable cause requirement is that when the ultimate probable cause determination is made, whether by a magistrate when a warrant is sought or upon a motion to suppress evidence obtained without a warrant, mere conclusions will not suffice." 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.5(e) (6th ed. 2020); *see also Nathanson v. United States*, 290 U.S. 41, 46–47 (1933) (holding that mere conclusions are insufficient for a search warrant); *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005) ("Mere opinions are ineffective substitutes for specific, articulable facts in a reasonable-suspicion analysis.").

[160]*United States v. Hammond*, 890 F.3d 901, 906 (10th Cir. 2018); *Johnson*, 482 F. App'x at 147; *DeWitt*, 341 F.3d at 446; *State v. Hoskins*, 711 N.W.2d 720, 726–27 (Iowa 2006).

[161]*Hammond*, 890 F.3d at 906–07 (quoting *United States v. Rice*, 483 F.3d 1079, 1085 (10th Cir. 2007)).

[162]*United States v. McNally*, 473 F.2d 934, 940 (3d Cir. 1973).

[163]*Johnson*, 482 F. App'x at 148.

emphatically cannot be characterized as trivial. In *Terry,* the United States Supreme Court declared that "[t]his inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs."[164] The *Terry* Court emphasized that "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience."[165] The *Terry* Court noted that pat-downs were performed in public with officers touching the entire body, including "arms and armpits, waistline and back, the groin and area about the testicles, and entire surface of the legs down to the feet."[166] As a result, the *Terry* Court noted, "It is simply fantastic to urge that such a procedure performed in public by [police] while the citizen stands helpless, perhaps facing a wall with his hands raised, is a 'petty indignity.' "[167] Consistent with *Terry,* the Court later stated that allowing police officers to search anyone thought to be armed would "create[] a serious and recurring threat to the privacy of countless individuals."[168]

Now some may characterize being ordered out of the car and frisked as a "minimal" intrusion, but no one on this planet who has been subject to a

---

[164]*Terry*, 392 U.S. at 8–9.

[165]*Id.* at 24–25.

[166]*Id.* at 17 n.13 (quoting L.L. Priar & T.F. Martin, *Searching and Disarming Criminals*, 45 J. Crim. L. Criminology & Police Sci. 481, 481 (1954)).

[167]*Id.* at 16–17.

[168]*Arizona v. Gant,* 556 U.S. 332, 345 (2009).

warrantless pat-down search on a public highway would endorse this description.[169] While the membership of the United States Supreme Court may have changed, the truth of the original *Terry* pronouncement has not.

Given the potential for harassment posed by stop-and-frisk, the *Terry* Court itself noted the potential that law enforcement actions may cause "community resentment" and therefore "is not to be undertaken lightly."[170] There is evidence that programmatic stop-and-frisk in cities has undermined trust among those searched and those who witnessed the search.[171] If perceptions of legitimacy are undermined by indiscriminate stop-and-frisk, the rule of law may be severely undermined.[172] Indeed, recent events show that, if anything, the stakes for the citizen are much higher than they were at the time of *Terry*. There is a growing body of literature related to injury and death to citizens arising out of encounters with police arising from traffic stops.[173] At least one authority has suggested that there is now sufficient data available that the holding in *Terry* should be revisited.[174]

---

[169]For a description of a pat-down search consistent with the description in *Terry* by a former police officer turned academic, see Seth W. Stoughton, Terry v. Ohio *and the (Un)Forgettable Frisk*, 15 Ohio St. J. Crim. L. 19, 29–30 (2017).

[170]*Terry*, 392 U.S. at 17 & n.14.

[171]Ross, 25 Wm & Mary Bill Rts. J. at 732.

[172]*See* Tom R. Tyler, *Why People Obey the Law* 57 (2006); Janice Nadler, *Flouting the Law*, 83 Tex. L. Rev. 1399, 1400 (2005).

[173]Jeffrey Fagan & Alexis D. Campbell, *Race and Reasonableness in Police Killings*, 100 B.U. L. Rev. 951, 989–99 (2020) (compiling fatal police shootings database and concluding that African–American suspects are more than twice as likely to be killed by police than persons of other racial or ethnic groups, even though there are no obvious circumstances during the police encounter that would warrant the deadly force used by the police).

[174]Ross, 25 Wm. & Mary Bill Rts. J. 689.

**H. The Problem of Implied Bias and Discriminatory Enforcement.** As suggested above, search and seizure has always been concerned, in part, with the use of government machinery against disfavored groups. With the passage of the Fourteenth Amendment and its clear command that all persons receive equal protection of the law, search and seizure law has a clear equality principle.

*Terry* recognized the interface between search and seizure law and race relations. In a footnote, *Terry* observed:

> The President's Commission on Law Enforcement and Administration of Justice found that "[i]n many communities, field interrogations are a major source of friction between the police and minority groups" . . . . This is particularly true in situations where the "stop and frisk" of youths or minority group members is "motivated by the officers' perceived need to maintain the power image of the beat officer, an aim sometimes accomplished by humiliating anyone who attempts to undermine police control of the streets."[175]

When subjective and elusive factors are involved, the prospect of arbitrary enforcement inevitably arises. Among other things, implicit bias can creep into stop-and-frisk decisions.

The question of implicit bias in stop-and-frisk has been explored by Dean L. Song Richardson.[176] Dean Richardson assumes that officers act in good faith in their stop-and-frisk behavior.[177] However, according to Dean Richardson,

---

[175]*Terry*, 392 U.S. at 14 n.11 (alteration in original) (citation omitted) (quoting President's Comm'n on L. Enf't & Admin. Just., *Task Force Report: The Police* 183 (1967)).

[176]*See generally* L. Song Richardson, *Arrest Efficiency and the Fourth Amendment*, 95 Minn. L. Rev. 2035 (2011) [hereinafter Richardson, *Arrest Efficiency*]; Richardson, *Cognitive Bias*, 44 Ariz. St. L.J. 267; Richardson, *Implicit Racial Bias*, 15 Ohio St. J. Crim. L. at 78; *see also* Kent Greenawalt, *Probabilities, Perceptions, Consequences and "Discrimination": One Puzzle about Controversial "Stop and Frisk,"* 12 Ohio St. J. Crim. L. 181 (2014); Justin D. Levinson & Robert J. Smith, *Systemic Implicit Bias*, 126 Yale L.J.F. 406 (2017).

[177]Richardson, *Implicit Racial Bias*, 15 Ohio St. J. Crim. L. at 75.

"even assuming good faith, it is inevitable that *Terry* stops and frisks will result in unjustified racial disparities regardless of officers' conscious racial motivations even when Black and White individuals are acting identically."[178] Dean Richardson emphasizes that social psychology over the past four decades "repeatedly demonstrates that most individuals of all races have implicit, i.e. unconscious, racial biases linking Blacks with criminality and Whites with innocence."[179] Dean Richardson cites computer simulations that show officers are "quicker to determine that individuals are armed when they are Black as opposed to White."[180] This is explained, in part, by research that shows that "it takes less time for the mind to process information that is congruent with racial stereotypes."[181] So, a quick decision is likely to be more influenced by implicit bias than a more deliberate one.

According to Dean Richardson, allowing officers to act on ambiguous behaviors "permits, rather than prevents, actions based upon racial hunches" that *Terry* sought to avoid.[182] Dean Richardson has noted the fact that reasonable suspicion is sometimes described in totally contradictory terms (i.e. defendant was "nervous," defendant was "calm") is consistent with the

---

[178]*Id.*

[179]*Id.*

[180]*Id.* at 77.

[181]*Id.*

[182]*Id.* at 83.

inconsistent accounts that does not require a finding that the officers engaged in intentional or deceitful explanations.[183]

Dean Richardson has noted the problematic impact of implicit bias is further exacerbated by fundamental attribution error.[184] Fundamental attribution error is a tendency to judge an individual's action as arising from fundamental personality traits rather than the situation itself.[185] Fundamental attribution error causes underestimation of situational factors in favor of more personal dispositional factors.[186] Further, research shows people tend to attribute negative behaviors of outgroup members to disposition and positive behaviors to the situation.[187]

I have expressed concern about the role implicit bias plays whenever a government actor is vested with broad discretion in making decisions.[188] Because broad discretion provides a rich environment for decision-making based on implicit bias, I have sought, consistent with historic search and seizure principles, to cabin and contain exercises of government power.[189] Because of

---

[183]Richardson, *Arrest Efficiency*, 95 Minn. L. Rev. at 2066.

[184]Richardson, *Cognitive Bias*, 44 Ariz. St. L.J. at 273.

[185]*Id.* at 269–71 (citing Andrew E. Taslitz, *Police Are People Too: Cognitive Obstacles to, and Opportunities for, Police Getting the Individualized Suspicion Judgment Right*, 8 Ohio St. J. Crim. L. 7, 17–18 (2010)).

[186]*Id.* at 270.

[187]*Id.* at 273.

[188]*State v. Veal*, 930 N.W.2d 319, 343 (Iowa 2019) (Appel, J., concurring in part and dissenting in part); *Williams*, 929 N.W.2d at 642–45 (Appel, J., concurring in part and dissenting in part); *State v. Plain*, 898 N.W.2d 801, 830–36 (Iowa 2017) (Appel, J., concurring specially).

[189]*See State v. Warren*, 955 N.W.2d 848, 873 (Iowa 2021) (Appel, J., dissenting) (opposing search and seizure based upon completed traffic violation in part on grounds that such broad police power would be a breeding ground for implicit bias); *Brown*, 930 N.W.2d at 871 (Appel, J.,

implicit bias, "ambiguous behaviors [are viewed] as more threatening and suspicious when engaged in by Black individuals versus White individuals."[190]

Perhaps the frankest discussion of the risks of implicit bias, however, can be seen in the concurring opinion of Justice Wiggins in *State v. Plain*.[191] Speaking for a near majority of the court, Justice Wiggins cited a report of The Sentencing Project that demonstrated that while 25.8% of the Iowa prison population was African-American, African-Americans constituted only 3.1% of the population in Iowa.[192] Justice Wiggins described the statistics as shameful and attributed much of the disproportionality to implicit bias.[193]

There is ample empirical evidence generally supporting the notion that race plays a role in discretionary law enforcement decisions. For example, among suspects stopped by the police, people of color are more likely to be arrested than whites.[194] Indeed, study after study has shown that men and women of color are "over-stopped, over-frisked, over-searched, and over-arrested."[195]

---

dissenting) (opposing pretextual traffic stops where driving violations are ubiquitous as arbitrary exercise of police power where implicit bias may be a factor).

[190]Richardson, *Implicit Racial Bias*, 15 Ohio St. J. Crim. L. at 76.

[191]*See generally Plain*, 898 N.W.2d at 830 (Wiggins, J., concurring specially).

[192]*Id.* (citing Ashley Nellis, The Sent'g Project, *The Color of Justice: Racial and Ethnic Disparity in State Prisons* (2016)).

[193]*Id.*

[194]Tammy Rinehart Kochel et. al., *Effect of Suspect Race on Officers' Arrest Decisions*, 49 Criminology 473, 498–503 (conducting thorough analysis of different databases and concluding that race indeed plays a role in an officer's arrest decisions) (2011).

[195]Ian Ayres & Johnathan Borowsky, ACLU of S. Cal., *A Study of Racially Disparate Outcomes in the Los Angeles Police Department* 27 (2008); *see, also Commonwealth v. Warren*, 58 N.E.3d 333, 340–42 (Mass. 2016) (holding flight in high crime area not sufficient under *Terry* because stop data in Boston showed substantial and intentional racial disparities in stop-and-frisk of black men); *State v. Soto*, 734 A.2d 350, 352–54 (N.J. Super. Ct. Law Div. 1996) (noting African-Americans disproportionately stopped on New Jersey turnpike with statistical standard deviation of 16.35); *Floyd*, 959 F. Supp. 2d at 558–59 (finding 52% of stops were African-

## III. Independent State Constitutional Development.

State courts have not uniformly done a better job than the United States Supreme Court on search and seizure issues. Some simply follow the United States Supreme Court's precedents as if the Court has some superior insight on search and seizure issues than state court judges. Some just do a cut and paste job of federal precedents as a matter of efficiency and do not offer their independent views. Yet, many state supreme courts have engaged in serious independent analysis of search and seizure law under their state constitutions.[196]

The Alaska courts have departed from *Terry* in a significant way. The seminal case is *Coleman v. State*.[197] In *Coleman*, the Alaska Supreme Court held that the *Terry* rule would apply only "where the police officer has a reasonable suspicion that imminent public danger exists or serious harm to persons or property has recently occurred."[198] The Alaska approach is consistent with the

---

American while African-Americans made up only 23% of the population); Bernard E. Harcourt & Tracey L. Meares, *Randomization and the Fourth Amendment*, 78 U. Chi. L. Rev. 809, 854–59 (2011) (reviewing data and studies from across the country showing disparate impact based on race in search and seizure); Stephen Rushin & Griffin Edwards, *An Empirical Assessment of Pretextual Stops and Racial Profiling*, 73 Stan. L. Rev. 637, 697 (2021) ("[R]ules granting police discretion in traffic stops may lead to more traffic stops of drivers of color, with some likely escalating to more serious encounters."). *See generally* William H. Buckman & John Lamberth, *Challenging Racial Profiles: Attacking Jim Crow on the Interstate*, 10 Temp. Pol. & C.R. L. Rev. 387 (2001); Samuel R. Gross & Katherine Y. Barnes, *Road Work: Racial Profiling and Drug Interdiction on the Highway*, 101 Mich. L. Rev. 651 (2002).

[196]*See generally* LaKeith Faulkner & Christopher R. Green, *State-Constitutional Departures from the Supreme Court: The Fourth Amendment*, 89 Miss. L.J. 197 (2020); Nathaniel C. Sutton, Note, *Lockstepping Through Stop-and-Frisk: A Call to Independently Assess* Terry v. Ohio *Under State Law*, 107 Va. L. Rev. 639 (2021).

[197]*Coleman*, 553 P.2d 40.

[198]*Id.* at 46.

approach of Judge Friendly in his often cited dissenting opinion in *Williams v. Adams*.[199] In *Williams*, Judge Friendly concluded that *Terry* "was meant for the serious cases of imminent danger or of harm recently perpetrated to persons or property."[200]

Other state courts have emphasized the need to put some spine into *Terry* stops. Specifically, for example, a Pennsylvania appellate court has taken a skeptical view of the role of "nervousness" and "furtive movements" as providing reasonable suspicion in traffic stops.[201] The Minnesota Supreme Court departed from federal precedent under its state constitution in *State v. Askerooth* by holding, among other things, that the scope of a traffic stop cannot be expanded unless there is independent basis to do so.[202] The supreme courts of Massachusetts and Washington have declined to extend *Terry* to parking infractions under their state constitutions.[203] In *Commonwealth v. Warren*, the Massachusetts Supreme Judicial Court noted that "the finding that Black males in Boston are disproportionately and repeatedly targeted for [field interrogation and observation] encounters suggests a reason for flight totally unrelated to consciousness of guilt."[204] These observations are inconsistent with *Wardlow*.

---

[199] *Williams v. Adams*, 436 F.2d 30, 35–39 (2d Cir. 1970) (Friendly, J., dissenting), *rev'd en banc*, 441 F.2d 394 (2d 1971), *rev'd*, 407 U.S. 143 (1972).

[200] *Id.* at 39.

[201] *Commonwealth v. Buchert*, 68 A.3d 911, 916–17 (Pa. Super. Ct. 2013).

[202] *State v. Askerooth*, 681 N.W.2d 353, 365 (Minn. 2004) (en banc).

[203] *Commonwealth v. Rodriguez*, 37 N.E.3d 611, 620 (Mass. 2015); *State v. Duncan*, 43 P.3d 513, 519 (Wash. 2002) (en banc).

[204] *Warren*, 58 N.E.3d at 342.

**IV. Discussion.**

**A. Overview.** Under *Terry*, the State must show reasonable suspicion (1) that Price-Williams was engaged in illegal activity, and (2) that he was armed and dangerous.[205] A valid stop does not mean that a frisk is necessarily permitted. In order to engage in a frisk, there must be a reasonable suspicion that the individual is armed and dangerous.[206] I proceed to consider these questions.

In evaluating a *Terry*-type claim in the current setting, we should take into consideration the risks of implicit bias arising from less than objective indicia of reasonable suspicion, the racial anxiety that ordinarily may be expected from routine traffic stops, and the likely disproportionate impact of stop-and-frisk based on broad discretion. Unlike prior cases, we have the benefit of videocam footage which provides us with a much better opportunity to exercise the judicial supervision of police behavior as expected under both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. While Price-Williams does not propose a different legal framework for evaluating reasonable suspicion under article I, section 8 of the Iowa Constitution, we are free to apply the standard more stringently, or "with teeth," under Iowa law.[207]

---

[205] *Terry*, 392 U.S. at 27, 30; *see also Johnson*, 555 U.S. at 326–27 (noting two separate steps with each requiring its own justification); *Dickerson*, 508 U.S. at 374–377 (majority opinion) (discussing two-step *Terry* approach).

[206] *Terry*, 392 U.S. at 27.

[207] *See State v. Coleman*, 890 N.W.2d 284, 298 (2017) (applying *Schneckloth* "with teeth"); *see also* Cynthia Lee, *Reasonableness with Teeth: The Future of Fourth Amendment Reasonableness Analysis*, 81 Miss. L.J. 1133, 1159–60 (2012) (advocating the idea that courts should "conduct a more rigorous inquiry into the overall reasonableness of the search"); Richardson, *Cognitive Bias*, 44 Ariz. St. L.J. at 287–93 (recommending consideration of hit rates

While it may be in federal courts that reasonable suspicion has expanded and Fourth Amendment protections have contracted, I would reverse the process and adhere to the original notion of *Terry* of a "narrow" exception to the warrant requirement.

### B. Reasonable Suspicion of a Crime.

1. *Introduction.* The first question is whether officers had reason to believe that Price-Williams was engaged in illegal activity. In this case, the illegal activity was unlawful possession of a firearm. The validity of the *Terry* stop is judged by what the officers knew at the time of the stop, not what might have been gathered after the fact. The State has suggested three factors that support the search: nervousness, furtive movements, and Price-Williams's prior criminal record. I examine each of these factors below.

2. *Nervousness.* I begin with a discussion of nervousness in the presence of the officers. In my view, after viewing the videocams of the officers involved in this stop-and-frisk, there is no objective sign of criminal activity or dangerousness based upon nervousness of Price-Williams. Whenever law enforcement officers engage in a stop with lights flashing, most people have a degree of nervousness and anxiety. Video records do not show Price-Williams was acting beyond what is usually expected. Yes, he might have frozen for a split

---

and more stringent articulation and elimination of race proxies). *See generally* Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv. L. Rev. 757 (1994) (advocating stricter application of *Terry* through concepts of proportionality, better account of interests of personal dignity, and spacious consideration of race in police/citizen encounters); Robert Berkley Harper, *Has the Replacement of "Probable Cause" with "Reasonable Suspicion" Resulted in the Creation of the Best of All Possible Worlds?*, 22 Akron L. Rev. 13 (1988) (advocating strict *Terry* application).

second, but that is normal for anybody in his situation when their Lyft driver got pulled over.

Further, interactions between African-American citizens and white officers commonly gives rise to racial anxiety. There is simply nothing in the video that suggests objective evidence of a significantly increased level of nervousness to suggest a crime is being committed. It seems to me there are no concrete articulable facts here, but at most a subjective impression of nervousness. Certainly, standing alone, the claim of nervousness does not satisfy objective reasonable suspicion that Price-Williams is committing a crime. Instead, suggesting nervousness was a factor in this case would embrace a subjective approach that, if permissible, would open the door widely for a wide range of implicit biases to run rampant as a result of our search and seizure law.

3. *Furtive movements.* The second factor presented is furtive movements. Concrete and potentially threatening furtive movements in this case are nonexistent. What exactly amounts to a furtive gesture is unclear in the caselaw. Body cameras show that Price-Williams first put up his phone to the window to show the police that he was on his way to see his kid. When the officer told Price-Williams he did not need to call the child's mother to prove what he told the officer, he put the phone down. Shortly thereafter, video showed that the officer pointed a gun at Price-Williams. Price-Williams put both his hands up in surrender. There is no concrete, threatening furtive gesture on the video.

4. *Prior criminal record.* At the time of the *Terry* pat-down, the officers knew that Price-Williams had a criminal history that included illegal possession of a

weapon some fourteen months earlier and an arrest for eluding. This information was known by the officers involved at the time of the *Terry* pat-down in this case. Yet, the information was over a year old. It only provides a slender reed for reasonable suspicion and nothing to suggest an ongoing violation. Instead, it seems to fall more on the spectrum of a hunch rather than reasonable suspicion. That conclusion, at least, would follow the teaching of Sixth Circuit in *Johnson*, which I find persuasive.[208]

There is a clear distinction between a past history of using weapons violently and a mere history of possession. "[A] criminal record, standing alone, is not sufficient to create reasonable suspicion of anything."[209] At least one federal district court distinguishes between cases where suspects have engaged in violent activity and where mere possession is involved:

> Unlike the defendants in *Hammon* and *Rice*, Detter had no prior record of *using* weapons violently. Nor did the officers have a specific reason to believe Detter would react violently in this situation. Furthermore, the officers had no special reason to believe that Detter was armed at the time of the traffic stop. Detter lacks a history of involvement in violent gangs and has never been convicted of a violent crime. A single instance of past firearm possession does not give rise to the reasonable suspicion that Detter was armed and dangerous in this situation. As such, the Court holds that the *Terry* frisk of Detter was unlawful.[210]

5. *Totality of the circumstances.* At the end of the day, the question here is whether the weak indicators give rise to reasonable suspicion that Price-Williams

---

[208] *See Johnson*, 482 F. App'x at 143.

[209] *United States v. Rice*, 483 F.3d 1079, 1085 (10th Cir. 2007); *see also Hammond*, 890 F.3d at 906–07.

[210] *United States v. Detter*, 2019 WL 1206986, at *4 (D. Kan. Mar. 14, 2019).

was committing a crime by possessing a gun as a felon. Because of the porous nature of reasonable suspicion, it may be a close case. In any event, it is not necessary to address this question in light of the shortcomings in the record with respect to the second *Terry* requirement, namely, that the suspect be armed and dangerous.

**C. Reasonable Suspicion of "Armed and Dangerous."** In this case, there is little in the record to suggest that Price-Williams was actually dangerous beyond the fact that he may have been possessing a weapon. Mere possession of a weapon, even if that possession is unlawful, is not the same as being dangerous. So the question arises whether under *Terry* must police show that the individual was both armed *and* dangerous or is it sufficient simply to show that the defendant was armed.

As noted above, the caselaw is mixed on the question of whether a suspect must be both "armed and dangerous" or simply "armed" to support a *Terry* search. The cases invariably pay close attention to the precise language in *Terry*. Cases declaring a suspect must be both armed and dangerous point to the straightforward language itself. Cases suggesting that anyone armed is inherently dangerous point to the "thus" language in *Terry*. From a language perspective, both positions have a point.

The ambiguity in *Terry* is not entirely surprising. In *Terry*, the United States Supreme Court seemed to be struggling to achieve a compromise. The *Terry* Court seemed to have wanted to respond to concerns raised by the NAACP and others regarding the potential dangers of discretionary stop-and-frisk while

at the same time avoiding the public backlash associated with the Court's precedents like *Miranda.*

But clearly the legal landscape has changed since *Terry.* Lawful possession of guns has proliferated. Iowa has significantly liberalized its gun laws to permit open carry.[211] Can it be that thousands of Iowans who lawfully possess and carry firearms are automatically, and without more, subject to a *Terry* search? Would such a broad police authority to stop-and-frisk thousands of Iowans be a variant on a general warrant?

In my view, the "armed and dangerous" cases have the better view. *Terry* and its progeny are ambiguous on the point, but it is clear that under well-established search and seizure law, broad police discretion to engage in search and seizures of broad swaths of the population is problematic. Search and seizure law is concerned not only with specific abuse but the potential for abuse. I would join the circuits that have declared that a suspect must be both armed and dangerous.

Having resolved the critical legal question, the question arises whether there was specific, articulable evidence that Price-Williams was dangerous. I think not. Price-Williams was not uncooperative, did not engage in threatening gestures, and was not overtly hostile to police. The majority even recognized that Price-Williams's interaction with the officer was "amicable." He had no history of violent crime. The original traffic stop arose out of a very minor infraction. Price-

---

[211]Iowa Code § 724.7(1).

Williams was a Lyft passenger, traveling to see his child. Conclusory statements to the contrary quickly evaporate when exposed to the sunshine of facts, as demonstrated by the innocuous videocam footage in this case. Upon considering the totality of the circumstances, I would conclude that Price-Williams could not be subject to the *Terry* pat-down because of the lack of showing that Price-Williams was armed and dangerous.

**V. Conclusion.**

For the above reasons, I would conclude that the *Terry* pat-down in this case cannot be sustained under article I, section 8 of the Iowa Constitution.